UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BRIAN BATTLE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 11 C 1138 |
| v. | ) |
| | ) Judge Joan H. Lefkow |
| OFFICERS JENNIFER | ) |
| O'SHAUGHNESSY, KEVIN | ) |
| OSBORN, and the | ) |
| CITY OF CHICAGO | ) |
| | ) |
| Defendants. | ) |

**OPINION AND ORDER**

Plaintiff, Brian Battle, sued Chicago police officers Jennifer O'Shaughnessy and Kevin Osborn, and the City of Chicago under 42 U.S.C. § 1983, claiming excessive force, failure to intervene, and deliberate indifference to medical need, as well as several Illinois common law claims. The case proceeded to trial, and a jury returned a verdict in favor of defendants on all counts. Battle has moved for judgment as a matter of law and for a new trial. For the following reasons, Battle's motions for judgment as a matter of law and for a new trial are denied.

**BACKGROUND**[1]

On May 24, 2010, Battle was at the 12th Street Beach in Chicago with several friends. That night, defendant officers received a radio dispatch about a group of teens drinking alcohol there, so they drove to the scene. Officer O'Shaughnessy approached Battle and asked him to dump out the alcohol in his cup. Rather than comply, Battle responded that he was going to drink what was in his cup. Officer O'Shaughnessy noted that Battle had a strong odor of alcohol

---

[1] The facts are stated in a light most favorable to the defendants as is required for consideration of a motion for judgment as a matter of law. *See*, *e.g*, *Denius* v. *Dunlap* 330 F.3d 919, 927–928 (7th Cir. 2003) ("[O]n a motion for JMOL, it was the defendants' burden to show that no reasonable jury could have found for [plaintiff] when reviewing the evidence in a light most favorable to him.").

on his breath. She took the cup from Battle's hand and poured the contents on the ground. Battle then grabbed her arm and she pulled her wrist from his grip. Officer O'Shaughnessy told him that he was under arrest. She took out her handcuffs but each time she approached Battle he moved backwards and told her "not to fucking touch him." Dkt. 113, Def. Ex. A at 68:20–23.

Officer O'Shaughnessy called her partner, Officer Osborn, for assistance. Battle continued to pull away, screaming and yelling. Eventually, defendant officers handcuffed Battle, but he remained hostile, and he started kicking. Officer O'Shaughnessy repeatedly told Battle to relax and calm down. In order to gain control over Battle the officers conducted an emergency takedown by grabbing him by the rear of the handcuffs and the arm and forcing him to the ground.

On the ground he continued to kick and scream obscenities, preventing the officers from approaching him. While on the ground, Battle kicked Officer Osborn. Officer Osborn told Battle that if he did not stop kicking he would use a taser. Battle did not comply. Officer Osborn deployed the taser once, but Battle continued kicking his legs. Officer Osborn warned him that he would use it again if he did not stop kicking. Officer Osborn then applied the taser directly to Battle's chest for three to four seconds. Officer Osborn then assisted Battle, who was able to walk under his own power to the transport vehicle.

Battle was taken to the police station. He was charged with aggravated assault to a police officer, battery, drinking alcohol on the public way, and remaining on Chicago Park District property after hours. On December 28, 2010, Battle was found not guilty of aggravated assault to a police officer and battery.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 50(b), judgment as a matter of law may be entered where "there is no legally sufficient evidentiary basis for a reasonable jury to find for [a] party on [an] issue." *Kossman* v. *Ne. Ill. Reg'l Commuter R.R. Corp.,* 211 F.3d 1031, 1036 (7th Cir. 2000) (quoting Fed. R. Civ. P. 50) (internal quotation marks omitted) (alterations in original). After reviewing the record and drawing all reasonable inferences in the light most favorable to the non-moving party, the court must determine whether the verdict is supported by sufficient evidence. *Id.*; *Tincher* v. *Wal-Mart Stores, Inc.*, 118 F.3d 1125, 1129 (7th Cir. 1997). In doing so the court will not make credibility determinations or weigh the evidence. *Schandelmeier-Bartels* v. *Chicago Park Dist.*, 634 F.3d 372, 376 (7th Cir. 2011). The court will only overturn a jury verdict if it concludes that "no rational jury could have found for the [non-moving party]." *Collins* v. *Kibort*, 143 F.3d 331, 335 (7th Cir. 1998) (internal quotation marks omitted).

Rule 59(a)(1) states that "[t]he court may, on motion, grant a new trial on all or some of the issues--and to any party--as follows: (A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]" Fed. R. Civ. P. 59(a)(1). When deciding whether to grant a new trial, the court "must determine whether the verdict is against the weight of the evidence, the damages are excessive [or insufficient], or if for other reasons the trial was not fair to the moving party." *Shick* v. *Ill. Dep't of Human Servs.,* 307 F.3d 605, 611 (7th Cir. 2002) (brackets in original) (internal quotation marks omitted). "The misconduct of counsel . . . justifies a new trial where that misconduct prejudiced the adverse party." *Davis* v. *FMC Corp., Food Processing Mach. Div.*, 771 F.2d 224, 233 (7th Cir. 1985) (internal quotation marks omitted). A court should grant a new trial based on the erroneous admission or exclusion of evidence only if that error "had a substantial influence over the jury,

and the result reached was inconsistent with substantial justice." *Agushi* v. *Duerr,* 196 F.3d 754, 759 (7th Cir. 1999) (internal quotation marks omitted).

## ANALYSIS

I. **Renewed Motion for Judgment as a Matter of Law**

Battle argues that he is entitled to judgment as a matter of law on his excessive force claim against Officer Osborn because the amount of force used by Officer Osborn when deploying his taser gun directly on his chest was unreasonable as a matter of law.

The force used by officers to effect an arrest must be objectively reasonable under the Fourth Amendment. *Chelios* v. *Heavener*, 520 F.3d 678, 689 (7th Cir. 2008). To determine whether such force was reasonable, the court must engage in a "careful balanc[ing] of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* (quoting *Morfin* v. *City of E. Chicago*, 349 F.3d 989, 1004 (7th Cir. 2003) (alterations in original)). The court considers the specific circumstances of the arrest, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Phillips* v. *Cmty. Ins. Corp.*, 678 F.3d 513, 519 (7th Cir. 2012) (quoting *Graham* v. *Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)). Courts evaluate reasonableness "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

Battle relies on *Phillips*, in which the court held that the force used was excessive as a matter of law where the police, failing for ten minutes to get compliance from a drunk but stopped and passive driver of an automobile, shot her four times in the leg with an SL6 baton launcher causing injuries, including a "six-inch wound requiring thirty stitches because the flesh

was torn from the bone." *Phillips*, 678 F.3d at 518, 524. The plaintiff's only act of defiance was to fail to leave the vehicle, which was not active resistance but, rather, passive noncompliance "*requiring the minimal use of force.*" *Id.* (quoting *Smith* v. *Ball State Univ.*, 295 F.3d 763, 771 (7th Cir. 2002)).

Unlike the facts in *Phillips*, Battle did not simply exhibit passive noncompliance. According to the officers, Battle actively resisted their directions after they had reasonable cause to arrest him for drinking on a public way, and he posed an immediate threat to their safety. They related that Battle was hostile throughout the entire interaction, moving away from the officers, shouting profanities, and kicking his legs. Officer Osborn testified that Battle kicked him when he tried to approach Battle, and Officer O'Shaughnessy testified that while Battle was on the ground they could not safely approach his body without being kicked. Battle did not stop kicking his legs until after Officer Osborn successfully deployed the second taser against him. A reasonable jury believing this testimony could find that the second use of the taser was reasonable under the circumstances.

Moreover, the force used in *Phillips* was greater than the force used against Battle, and the injury to the plaintiff was more severe. The SL6 baton launcher is a shoulder-fired, semi-automatic firearm that fires polyurethane bullets with a force equivalent to a .44 magnum pistol. *Id.* at 518. The court noted in *Phillips* that "[o]ther courts of appeals have observed that baton launchers and similar 'impact weapons' employ a substantially greater degree of force than other weapons categorized as 'less lethal,' such as pepper spray, tasers, or pain compliance techniques." *Id.* at 521. While both tasers and SL6 baton launchers are considered "less-lethal" weapons, the Seventh Circuit concluded that the SL6 baton launcher is on the "high end of less-lethal force." *Id.* at 521–22. The record does not reflect the lethality of tasers, but there is

5

literature suggesting known and serious risks to children, the elderly, pregnant women, and those under the influence of drugs.  *See*, *e.g.*, STANFORD CRIMINAL JUSTICE CENTER, "Use of Tasers by Law Enforcement Agencies: Guidelines and Recommendations."[2]  Battle did not fall into a known vulnerable class and did not suffer serious or enduring effects, which tends to reinforce defendants' position that the force was not excessive in this instance.

Battle relies on eight cases from outside this circuit in which summary judgment was denied to the defendant police officers because the force used was not objectively reasonable as a matter of law.[3]  The analysis in these cases differs from the present case in two ways.  First, in assessing the defendants' motions for summary judgment, these courts reviewed the facts in the light most favorable to the plaintiffs.  On a plaintiff's motion for judgment as a matter of law, the facts are viewed in the light most favorable to the defendants.  *See Tincher*, 118 F.3d at 1129.  Second, a motion for summary judgment means only that a genuine dispute of material fact exists that should be decided by a jury.  Fed. R. Civ. P. 56(a).  In contrast, judgment as a matter of law requires the court to conclude that no rational jury could find for the defendant officers.  *Collins*, 143 F.3d at 335.

Here, sufficient evidence was presented at trial to permit a reasonable jury to conclude that Battle was actively resisting arrest and posing an immediate threat to defendant officers.

---

[2]  Stanford Criminal Justice Center, http://www.law.stanford.edu/sites/default/files/child-page/164097/doc/slspublic/tasers.pdf.

[3]  For example, Battle cites *Kijowski* v. *City of Niles*, 372 F. App'x 595, 600 (6th Cir. 2010) (reversing district court's grant of summary judgment because if plaintiff's version of events is correct, then defendant officer deployed his taser unreasonably); *Orem* v. *Repham*, 523 F.3d 442, 449 (4th Cir. 2008) (affirming district court's denial of summary judgment where defendant officer "used the taser to punish or intimidate [plaintiff] – a use that is not objectively reasonable, is contrary to clearly established law and not protected by qualified immunity" where arrestee was handcuffed and hobbled); *Alkhateeb* v. *Charter Twp. of Waterford*, 190 F. App'x 443, 452 (6th Cir. 2006) ("[I]n this Circuit, the law is clearly established that an officer may not use additional gratuitous force once a suspect has been neutralized.").

*See Graham*, 490 U.S. at 396. Thus, the jury was free to conclude that the force used against Battle was not excessive.

## II. Motion for a New Trial

Alternatively, Battle moves for a new trial according to Federal Rule of Civil Procedure 59(a), arguing that (1) defense counsel, Richard Levy, made improper statements during closing argument and (2) defense counsel improperly used a peremptory challenge based on a prospective juror's race.

### A. Improper Statements in Closing Arguments

Battle argues that he is entitled to a new trial because he suffered unfair prejudice as a result of improper statements made by Mr. Levy during closing argument that referred to matters excluded *in limine* and improperly appealed to the jurors' emotions.

As an initial matter, Battle's attorney objected to only two of the seven statements to which he now assigns error. A party that fails to object waives his challenge to allegedly improper statements made during closing argument. *See Soltys* v. *Costello*, 520 F.3d 737, 745 (7th Cir. 2008); *Houskins* v. *Sheahan*, 549 F.3d 480, 495 (7th Cir. 2008); *Deppe* v. *Tripp*, 863 F.2d 1356, 1364 (7th Cir. 1988) (party must object to errors that occurred during closing arguments before the case is submitted to the jury in order to preserve them for review); *Gonzalez* v. *Volvo of Am. Corp.*, 752 F.2d 295, 298 (7th Cir. 1985) (a party in a civil case is "bound by its silence at trial."). Battle's failure to object to the statements during the defense's closing argument compromises his ability to rely on those statements as a basis for a new trial.[4]

---

[4] This court generally discourages objections during closing arguments absent serious need. Moreover, counsel may have been reluctant to interpose objections and thereby draw further attention to the issue. That conceded, Battle's counsel did not register objection after the defense's closing argument outside the presence of the jury, as they might have.

Even if Battle had made timely objections, he would still have to demonstrate that defendants' closing argument prejudiced the jury to an extent warranting his request for a new trial. "[I]mproper comments during closing argument rarely rise to the level of reversible error." *Willis* v. *Lepine*, 687 F.3d 826, 834 (7th Cir. 2012) (internal quotations omitted). To warrant a new trial, the statements must result in substantial prejudice to the opposing party. *Id.* It is appropriate for defense counsel in closing argument to forcefully highlight the weaknesses of its opponent's case so long as the argument is based on the evidence presented at trial. *See Jones* v. *Lincoln Elec. Co.*, 188 F.3d 709, 731 (7th Cir. 1999).

Battle points to seven statements that he argues were improper:

MR. LEVY: These officers are not going to come in here and put their very livelihoods in jeopardy to lie about this master criminal.
MS. PREYAR: Objection, motion *in limine*.
THE COURT: Sustained.

[Dkt. 105, Pl.'s Ex. C, at 13:6–10.]

MR. LEVY: I would ask that you not be thrown off the scent here, and that this race baiting here really—it really stinks. You don't seek financial rewards for tarnishing the good names and reputations of decent people.
MS. PREYAR: Same objection.
MR. LEVY: You get your—
THE COURT: Sustained. Stick to the evidence.

[*Id.* at 13:15–21.]

MR. LEVY: These officers are not symbols; they are real people. They have real lives, real family, mortgages, responsibilities. And they have been put in jeopardy by something that they do not deserve.

[*Id.* at 3:2–5.]

MR. LEVY: And it is about enforcing our laws so that we can have some modest quality of life in our city, so that we can bring our families and go to the aquarium, so that we can enjoy some tranquility at our lakefront—
MS. PREYAR: Judge—
MR. LEVY: —at our parks.
THE COURT: That's probably enough of that.

> MR. LEVY: … I mean, it is quite topsy-turvy in these times that our clients need you to serve and protect them.

[*Id.* at 3:12–21.]

> MR. LEVY: So he calls the police, and the police respond to these difficult scenarios. It is a thankless task, but that's how you maintain some quality of life.

[*Id.* at 7:17–19.]

> MR. LEVY: This lawsuit really represent—it represents another way for a guy who was found not guilty—and that happens in this over-taxed times, guys get off—is another way for him to be defined. It is another way for him to play the hustle. I would ask that you reject it for the manipulation that it is, and to consider that these cops have to be put in jeopardy for just going ahead and trying to do a decent job.

[*Id.* at 9:25–10:6.]

> MR. LEVY: What makes for a just result is that you reject his con game, and you give back these officers the dignity and the respect they deserve for doing a tough job, and that you send him home with no money.

[*Id.* at 15:13–16.]

Battle first argues that the defense strongly implied that the defendant officers were not indemnified by the City, contrary to the court's ruling excluding references to that fact. He relies on *Joseph* v. *Brierton*, 739 F.2d 1244 (7th Cir. 1984), in which the court remanded for a new trial because of defense counsel's reference to evidence suggesting that the defendant correctional officers would be subject to a large judgment if they were found liable when he knew they were indemnified. *Id.* at 1246-47. The trial judge instructed the jury:

> If you decide on liability in this case and therefore turn to the question of damages, do not concern yourself with the defendants' ability to pay. If there is a judgment that problem will be addressed later. A judgment, if any, should reflect your decision as to the appropriate amount of damages to be awarded to the plaintiff . . . and that's all.

*Id.* at 1247. "In these circumstances the district judge was required to do more than he did: either to grant a mistrial or to let the jury know that the defendants were indemnified." *Id.* at 1248.

In the instant case, the court granted Battle's motion to bar evidence or testimony that the City of Chicago would indemnify defendants on the condition that, if defendant officers presented evidence that they may face financial hardship as a result of an adverse verdict, the court would instruct jurors that they would be indemnified for any compensatory damages. During her direct examination, Officer O'Shaughnessy revealed information about her personal financial situation, including her current salary, the cost of her children's education, and the fact that she owns a home. Dkt. 113, Def.'s Ex. A at 61:12–25; 62:1–3. The court promptly instructed the jury, "The officer's resources have to do with the issue of punitive damages only, so don't consider this testimony for any other purpose." *Id*. at 62:8–10. Battle did not seek leave to cross-examine Officer O'Shaughnessy to elicit the fact that she was indemnified nor did he submit an instruction to that effect. Thus, if the jury did not infer from the instruction that the officers were indemnified for compensatory damages, Battle did not take action to make it clear when he could have. Thus, the court is not persuaded that he is entitled to a new trial for this reason.

Battle's other argument has more force. Several of these statements ran afoul of the court's *in limine* rulings precluding arguments heroizing police officers in general and suggesting that a finding against the officers would mar their exemplary records.[5] This alone

---

[5] *See* Pl.'s Mot. *in Limine* #11 to Bar Argument or Evidence that Defendants Will Endure Financial Hardship if Plaintiff is Awarded Any Damages, Dkt. 54; Pl.'s Mot. *in Limine* #12 to Bar Reference or General Argument that Seeks to "Heroize" Police Officers in General, Dkt. 56 (including arguments claiming that "[p]olice officers risk their lives every day," "[p]olice officers get up every morning to face dangerous situations/fight criminals/protect us," and "[p]olice officers serve and protect you."); Pl.'s Mot. *in Limine* #14 to Bar Argument that a Finding of Liability Will Mar Defendants' Exemplary or Distinguished Record, Dkt. 58; Order on Mots. *in Limine*, Dkt. 71 (granting Dkts. 54, 56, and 58).

10

was improper argument, which tended to distract the jury from assessing the evidence fairly and impartially by invoking sympathy for police officer defendants who have a difficult job.

More disturbing, defense counsel made numerous statements in closing that could be fairly characterized as intended to evoke racial stereotypes about African-Americans, in addition to attacking the character and motives of Battle. Defense counsel called Battle a "hustler" four times (Dkt. 105, Pl.'s Ex. C, 6:5–7; 9:25; 10:1–6; 15:12–13); said Battle did not pay his legal and medical bills and told the jury he would not pay those bills (*id.* at 12:12–13; *id.* at 13:22–25); called Battle an "irresponsible man" (*id.* at 10:16), a "master criminal" (*id.* at 13:6–10), and "the kind of man who would put his hands on a female police officer" (*id.* at 14:18–20). He suggested that Battle "[got] off" the criminal charge but was actually guilty (*id.* at 9:25–10:3); twice called the lawsuit a "con"(*id.* at 8:9–10; *id.* at 15:13–16); referred to "race baiting" twice (*id.* at 12:18; *id.* at 13:16); referred to Battle and "the group" talking "smack" three times (*id.* at 7:22–25; *id.* at 8:1–3); and referred to Gordon Battle as Battle's "half-brother" twice (*id.* at 6:9; *id.* at 8:11–12). Defense counsel also referred to the need to protect the quality of life in the city so families could come to the lakefront and the parks. *Id.* at 3:12–21.

Defendants contend that these statements were based on reasonable inferences based on the evidence presented at trial. *See Durant* v. *Surety Homes Corp.*, 582 F.2d 1081, 1089 (7th Cir. 1978) ("[S]uggesting inferences to a jury in final argument without misstating the supporting evidence is perfectly proper."). Arguing the evidence during closing argument is appropriate, of course. Calling Battle a "master criminal," an "irresponsible man," and the "kind of person who would put his hands on a female police officer," by contrast, was not based on the evidence and was relevant only to Battle's character, not the merits of his claim. Similarly, labeling the lawsuit a "hustle," a "con," and "race baiting" is irrelevant and plainly improper.

Moreover, repeatedly referring to Gordon Battle as plaintiff's "half-brother" where Battle's counsel used the term "brother" served no purpose other than to suggest the stereotype of family instability among African-Americans.

These tactics by defense counsel were disappointingly unprofessional. Whether they merit the sanction of a new trial is not as clear cut. The court sustained objections where Battle's attorney objected and instructed the jury not to consider closing arguments as evidence. The jury is presumed to follow the court's instructions "absent an overwhelming probability that the jury will be unable to disregard inadmissible evidence and a strong likelihood of a devastating effect from the evidence . . . ." *Turner* v. *Miller*, 301 F.3d 599, 604 (7th Cir. 2002) (citing *Raybestos Prods.* v. *Younger*, 54 F.3d 1234, 1239 (7th Cir. 1995)). "[A]n instruction to the jury stating that the arguments of counsel are not evidence can mitigate the harm potentially caused by improper statements made by counsel during closing argument." *Banister* v. *Burton*, 636 F.3d 828, 834 (7th Cir. 2011) (quoting *Valbert* v. *Pass*, 866 F.2d 237, 241 (7th Cir. 1989)); *see Lenard* v. *Argento*, 699 F.2d 874, 897 (7th Cir. 1983) (improper statements of counsel made "in the context of all the evidence and the clear cautionary instructions of the trial court regarding the arguments of counsel, … do not rise to the level of reversible error."). On the other hand, as the court stated in *Brierton*, "the efficacy of [curative] instruction[s] is always uncertain, and where the misconduct giving rise to it is as serious as it was in this case stronger medicine may be needed." 739 F.2d at 1247.

Battle argues that the cumulative effect of the improper statements resulted in substantial prejudice to him. For Battle to prevail on this argument he must show "(1) that multiple errors occurred at trial; and (2) those errors, in the context of the entire trial, were so severe as to have rendered [his] trial fundamentally unfair." *Christmas* v. *City of Chicago*, 682 F.3d 632, 643 (7th

Cir. 2012) (quoting *United States* v. *Powell*, 652 F.3d 702, 706 (7th Cir. 2011)). In conducting this analysis, the court examines the entire record, "paying particular attention to the nature and number of alleged errors committed; their interrelationship, if any, and their combined effect." *Id.* (quoting *Powell*, 652 F.3d at 706). The court will also consider "the efficacy of any remedial measures" and "the strength of the [non-moving party's] case." *Id.*

Although the comments above reflect the court's disapproval of defense counsel's tactic, on balance, it is not persuaded that, even without the improper argument, there is a reasonable likelihood that the result would have been different. The record does not reflect multiple errors at trial, as set out above. Where the closing argument was concerned, when Battle's attorney objected, the court sustained the objection, thereby signaling to the jury to disregard the comments, and it formally instructed the jury to disregard any statements in closing argument that differed from the evidence presented at trial. On the merits, the evidence that Battle was combative and under the influence of alcohol was strong. The evidence that the use of a taser was excessive force under the circumstances was not strong. Accordingly, the court cannot conclude that defense counsel's statements resulted in substantial prejudice to Battle requiring a new trial.

### B. *Batson* Motion

Battle also asserts that he was denied a fair trial because this court erred in denying his *Batson* motion after the prosecution struck the only African-American from the venire. *See Batson* v. *Kentucky*, 476 U.S. 79, 93–94, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). Pursuant to *Batson,* courts apply a three-step analysis in considering challenges to a party's use of peremptory challenges: (1) the moving party must make a *prima facie* showing of discrimination; (2) the non-moving party must then present a race neutral explanation for use of

the peremptory challenge; and (3) the court then determines whether the non-moving party's stated reason is pretextual and whether the moving party has proven purposeful discrimination. *See id.* at 93–94, 97–98. This finding "largely will turn on [the court's] determination of credibility." *Id.* at 98 n.21.

To make a *prima facie* showing under the first step in *Batson,* the moving party must demonstrate that he is a member of a racial group, that the non-moving party used peremptory challenges to remove potential jurors of the moving party's race, and that the relevant circumstances create an inference of intentional discrimination. *See id.* at 96. "To survive a *Batson* challenge, a peremptory strike need not be based on a strong or good reason, only founded on a reason other than race or gender." *United States* v. *Hudson*, 49 F. App'x 79, 80 (7th Cir. 2002) (citing *United States* v. *James*, 113 F.3d 721, 729 (7th Cir. 1991)). The race-neutral explanation must be "clear and reasonably specific," but it "need not rise to the level justifying exercise of a challenge for cause." *United States* v. *Canoy*, 38 F.3d 893, 898 (7th Cir. 1994) (quoting *Batson*, 476 U.S. at 97–98 & n.20). Unless discriminatory intent is inherent in defense counsel's explanation, the reason will be deemed race-neutral. *Id.* (citing *Hernandez*, 500 U.S. at 358–59).

The defense used one of its three peremptory challenges to strike the only African-American on the venire. To Battle's *Batson* challenge, defense counsel responded that the reason for the strike was that the prospective juror's "primary television viewing was reality TV." Dkt. 113, Def. Ex. I at 53:10–12. He stated that reality TV shows, such as "Keeping Up with the Kardashians" and "The Real World," are "more dramatic" and "tend to display youths involved in excessive drinking and acting out with one another, and constantly fighting with one

another all the time." *Id*. at 53:11–16. He further stated that the shows are "more emotional" and "very much anti-intellectual." *Id*. at 53:18–19.

Plaintiff's counsel argued that these statements were based on assumptions about which reality TV shows the potential juror watched, suggesting that not all reality TV shows display such "emotional" and "anti-intellectual" behavior. *Id*. at 54:2–7. Plaintiff's counsel claimed that defense counsel's failure to ask which shows the potential juror watched showed that the reason for the strike was pretextual. The court then called the prospective juror back into the room to ask which shows were her favorite, to which she responded "Basketball Wives" and "Jersey Shore." *Id*. at 55:16–17. Because the response confirmed the explanation defense counsel had given, the court accepted the strike and denied the *Batson* challenge. The court on reexamination is satisfied with its ruling.

## CONCLUSION

For the foregoing reasons, Battle's motions for judgment as a matter of law and for a new trial are denied.

Dated: August 2, 2013                                        ENTER:

 

_____
JOAN HUMPHREY LEFKOW
United States District Judge